UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| L.M., *by and through her parents and next friends,* M.M. and M.M., <br><br> Plaintiff, <br><br> v. <br><br> HENRY COUNTY BOARD OF EDUCATION, *et al.*, <br><br> Defendants. | Civil No. 3:18-CV-00037-GFVT <br><br><br> **OPINION** <br> **&** <br> **ORDER** |

\*\*\* \*\*\* \*\*\* \*\*\*

# I

## A

Kentucky school children are entitled to a Free Appropriate Public Education (FAPE).[1] 20 U.S.C. 1412(a). But L.M. alleges Henry County Schools denied her an appropriate education. And, seeing no other option, L.M.'s parents removed her from public school and unilaterally placed her at Summit Academy—a private school for children with learning difficulties. The Hearing Officer determined that the Henry County Schools had provided a FAPE and rejected L.M.' claim. Tr. 169-199. The Exceptional Children Appeals Board disagreed and found that Henry County Schools did not provide FAPE. *Id.* at 272-300. Nonetheless, though, the Board determined that Summit Academy was not an appropriate placement. The parties now believe

---

[1] Unfortunately, Individuals with Disabilities Education Act (IDEA) cases require numerous acronyms. *See B.R. ex rel. K.O. v. New York City Dept of Educ.*, 910 F.Supp.2d 670, fn. 1 (S.D.N.Y. 2012) (One suspects that regulators and bureaucrats love such jargon because it makes even simple matters cognizable only to the cognoscenti and thus enhances their power at the expense of people who only know English. Nevertheless, acronyms have so invaded IDEA practice that this judge, like others before him, is pretty much stuck with having to use them.") To the extent possible the Court uses alternatives to those acronyms.

that ECAB only got one half of its determination correct. Henry County Schools disputes that it failed to provide a FAPE. [R. 25.] Meanwhile, L.M. believes that Summit Academy was a proper placement entitled to tuition reimbursement. [R. 30.] Neither Henry County Schools nor L.M.'s attacks on the Board's determination are persuasive, but first a little background is necessary.

From a young age, L.M. showed difficulty learning in a traditional school setting.[2] *Id.* So, to assist LM in overcoming these difficulties the school began a 504 plan, which entitled her to some accommodations.[3] *Id*. at 274-275. Unfortunately, the 504 did nothing to end L.M.'s behavioral problems. *Id.* Responding accordingly, an Admissions and Release Committee was convened to determine whether she was eligible for Individuals with Disabilities Education Act (IDEA) services. *Id.* at 276. That inquiry determined that L.M. had Emotional Behavior Disability, a qualifying disability under the IDEA. *Id.*

L.M.'s IDEA eligibility triggered the next step—an Individualized Education Program (IEP). For L.M. this plan primarily called for her to properly manage her feelings with supports. *Id.* at 276-277. Not long after instituting the IEP however, L.M. was hospitalized at Our Lady of Peace for threatening suicide over frustration with homework. *Id*. at 82. During her hospitalization, she was briefly educated by Crossroads, Our Lady's educational component. *Id*. at 277. The Committee was reconvened to assist L.M.'s transition back to Henry County Schools. But L.M.'s parents allege the Committee's plans undermined her chances at succeeding.

---

[2] She was diagnosed with ADHD, Generalized Anxiety Disorder, and Dysthymic Disorder
[3] A 504 is developed for students who do not require specialized instruction, like an IEP, but still need assurances that they will receive equal access to public education and services.

L.M.'s IEP goals and objectives remained largely the same for her fifth-grade year. *Id.* at 278. But her continued behavioral problems caused the Committee to initiate a Functional Behavior Assessment (FBA), adopt a Behavioral Interventional Plan, and institute occupational therapy services. The Committee did not, however, accept the parents request for a more restrictive classroom placement. *Id*. at 279. Instead L.M. often ended up in the in-school suspension room because of her behavioral issues. *Id*. at 284.

The failure to alleviate L.M.'s behavior problems finally reached an impasse when, in April 2016, L.M. became upset at an assembly, refused teachers' instructions to leave, and had to be restrained. *Id*. at 280. Rather than completing her year at Henry County Schools, L.M. finished the year at her house on Home Instruction. And, as a result of this incident, the parents enrolled L.M. at the Summit Academy for her sixth-grade year. *Id*. at 281. Henry County Schools offered a new IEP, but L.M. remained enrolled at Summit. *Id.* At the same time, they initiated this action by requesting a Due Process Hearing challenging the education she received in Henry County Schools and requesting compensation for her education at Summit Academy. *Id*. at 2. After winding its way through the administrative process, the case is now properly before this Court. The Court explains its decision below.

**B**

Kentucky schools must provide disabled children with a Free Appropriate Public Education. 20 U.S.C. § 1412(a)(1); 707 KAR 1:290(1). Primarily, schools provide a FAPE through an Individualized Education Plan. § 1412(a)(4); 707 KAR 1:320(1); *Gibson v. Forest Hills Local Sch. Dist. Bd. of Educ.*, 655 Fed. App'x 423, 426 (6th Cir. 2016). A proper IEP must include: a statement of present levels of achievement and performance; measurable annual goals;

a description of how those goals will be met; a statement of supplementary aids; explanation of the extent to which the students can be educated with nondisabled children; a statement of individual accommodations necessary to measure performance on state assessments; and a start date for services. § 1414(d)(1)(A)(i)(I-VIII); 707 KAR 1:320(5)(d)(7). IEPs are subject to an annual evaluation by the Admissions and Release Committee—a committee made up of the student's parents, various teachers, and others. § 1414(d)(1)(B), (4)(A)(i); 707 KAR 1:320(2)(6)(a), (3)(e). To the extent possible, a child should be educated in the Least Restrictive Environment, e.g. a student should be "mainstreamed" or educated with children who are not disabled. § 1412(a)(5); 707 KAR 1:350(1)(5), (8). And, for students whose behavior is a manifestation of their disability, positive behavioral supports must be considered. 34 CFR 300.530(f).

## C

While the parties have filed motions for summary judgment, that standard does not govern this case. Instead, the Court conducts an "independent" review of the administrative record and additional evidence, and determines, by the "preponderance of the evidence," whether there was an IDEA violation. *Bd. of Educ. Of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 205 (1982) (citing S. Conf. Rep. No. 94-455, p. 50 (1975)). Such an analysis goes beyond summary judgment and resolves disputed issues of fact, and makes a legal determination, without the possibility of going to trial. *See generally Doe v. Metropolitan Nashville Pub. Sch.*, 133 F.3d 384, 387 (6th Cir. 1998).

So here, the Court is required to determine whether Henry County met its duties under the IDEA using a modified *de novo* standard. But the Court must defer principally to the "final

decision of the state authorities," rendered by the Board. *Kenton County Sch. Dist. v. Hunt*, 384 F.3d 269, 283 (6th Cir. 2004) (Court declines the plaintiff's insistence that it defer to the Hearing Officer over the Board). Only if the evidence is "more likely than not to preclude the administrative decision from being justified on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both," should the Board's ruling be overturned. *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 519 (6th Cir. 2003). The Court should not "substitute [its] own notions of sound educational policy." *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). After reviewing the record and hearing new evidence, this Court can, "bas[ed] . . . on the preponderance of the evidence, . . . grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). For L.M. to receive reimbursement, she must show that (1) the public placement violated the IDEA and (2) the private placement is "proper" with respect to the IDEA. *Florence Cty. Sch. 1Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).

## II

### A

Henry County Schools was required to provide L.M. with an IEP that was "reasonably calculated to [help her] make progress appropriate in light of [her] circumstances." *Endrew F. ex rel. Joseph F. v. Douglas County School Dist. RE-1*, 137 S. Ct. 988, 999 (2017). While L.M. need not receive "substantially equal" opportunities as her non-disabled peers, she must receive an education "reasonably calculated to enable [her] to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204. A school can fail in its duty to enable advancement by creating a procedurally or substantively defective IEP. *Id.* Here, the Henry County Schools' violation was procedural.

5

Procedural defects are those defects which undermine the process by which an IEP is developed. To find a denial of a FAPE from a procedural violation, the student must show that the violation caused substantive harm. *Knable ex rel. Knable v. Bexley City School Dist.*, 238 F.3d 755 (6th Cir. 2004). And, a procedural violation becomes substantive and a denial of a FAPE if it: (i) impedes that child's right to make progress from grade to grade; or (ii) causes a substantive deprivation of benefits. *B.H. v. West Clermont Bd. of Educ.*, 788 F.Supp.2d 682, 696 (S.D. Ohio 2011).

When a child's behavior impedes her learning or that of other students, the school must consider the use of positive behavioral interventions and supports. 34 C.F.R. S. 300.324(a)(2)(i). And, L.M.'s emotional behavior disorder caused her to interfere with both her own and other's learning environments. So, during L.M.'s fifth grade year, the School decided to begin a Functional Behavior Assessment. An FBA works by determining the causes of a student's inappropriate behavior. To be successful, then, an FBA relies on specifically defining inappropriate behaviors. Afterwards, teachers and observers collect data on the student for those defined behaviors. If Henry County Schools failed to either adequately define the behavior or fails to collect high-quality data, the FBA will be useless. Here, Henry County Schools was guilty of both failures. As a result, the FBA had no chance of success. And, an improper FBA can inhibit a student's growth. Therefore, the Board appropriately found that the FBA provided by the School substantively undermined L.M.'s education and denied her a FAPE. The Court explains each of Henry County Schools' failures.

Henry County Schools' failures began with its definition of L.M.'s behaviors. The three behaviors identified by the School were: (i) leaving the classroom without permission; (ii) not

6

taking responsibility for her actions; and (iii) not having appropriate voice/tone. Tr. 287. L.M.'s expert, Dr. Natoff, testified that only the first category was observable, measurable and specific. *Id.* at 290. The second two behavioral categories did not meet the requirements of an adequate definition. L.M.'s second behavioral category was too broad because it could be broken into: hitting, kicking, throwing objects, taking things without permission. *Id.* Because overly broad and generalized behaviors are difficult to measure, that target behavior could not assist the development of an FBA. Conversely, Henry County Schools used the third, appropriate voice or tone, behavioral category captured too many behaviors, including refusal to work, to be useful. *Id.*

Likewise, Henry County Schools' data collection on L.M.'s target behaviors could not support an effective FBA. Both the Henry County Schools' underlying methods and follow through were imprecise, beginning with the tracking sheet created during the 2015-16 school year. That tracking sheet broke the day up into ten time periods—15 minutes to an hour long— and was intended for L.M.'s teacher to mark whether L.M. successfully demonstrated those three target behaviors. But, as Mr. Winslow, the School's observer, noted, the tracking sheet was not always available, and the time periods were too long. *Id*. at 288. While in general L.M. carries the burden of showing the School's failure, the School's own faculty found that the data collection was flawed. And, the School has not presented any evidence to support the time period lengths which were used. *See generally*, *T.M. on behalf of T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F.Supp.3d 792, 805-06 (E.D. Pa. 2017) (upholding a school's data collection technique when the school provide reasons to justify its methods). The data collected was also indecipherable. For example, Ms. Pohlman said she thought that L.M. was performing on target

7

behaviors at about 80 to 85 percent. Tr. at 434. Yet, at least as to the benchmark of "staying in the designated area" she did not know what the 88 percent calculation meant. *Id.* at 447. Between the random time periods and indecipherable data, Henry County Schools fell far below the standard that an IEP should be as scientific as possible. *See B.H.*, 788 F.Supp.2d at 296.

Nor did the School's observational study support an effective FBA. Over the course of two days Mr. Winslow witnessed eight acts of misbehavior: (i) L.M. leaving the classroom after her teacher whispered in her ear; (ii) not participating in a group project because she thought another student was too loud; (iii) putting her hands on another student; (iv) roaming the room with and uncapped marker and pouring the contents onto construction paper; (v) arguing with another student at lunch; (vi) not focusing on the teacher's instructions; (vii) going to the bathroom without permission; and (viii) kicking another student and complaining about the assignment. *Id.* at 287-289. Each of those incidents could have helped Henry County Schools understand the cause of L.M.'s behavior. Instead, nothing was recorded for the principle cause in all but a couple of incidents. Mr. Winslow's narrative did not do better—it failed to analyze what led to L.M.'s behaviors, what purposes those behaviors served, and the effect of consequences on those behaviors. As a result, the observational study did not aid the development of the FBA.

So, without specifically defined behaviors or useful data it was impossible to develop an FBA which could identify the patterns that preceded inappropriate behaviors. Nonetheless Henry County Schools attempted to blindly develop a behavior intervention plan based on the information it gathered. It is no surprise then that the Student's behavior got worse over the course of the fifth-grade year. Although Henry County Schools attempted revisions of the

behavioral intervention plan, any changes were as useful as throwing darts "at a dart board." *Id.* at 291. Therefore, as Dr. Natof testified, any change could have equally caused harm to L.M. by reinforcing bad behaviors. *Id.* at 292.

Henry County Schools counters that it had no duty to conduct an FBA[4], therefore any deficiency cannot form the bases for a denial of FAPE. It is wrong. Once it selected an FBA as the positive behavioral intervention, it must do it correctly. *See generally*, *Ostendorf v. Clark Equipment Co.*, 122 S.W.3d 530, 538 (Ky. 2003) ("one who volunteers to act, though under no duty to do so, is charged with the duty of acting with due care") (quoting Sheehan v. United Services Auto Ass'n, 912 S.W.2d 4, 6 (Ky. App. 1992)). L.M. relied on Henry County Schools to properly administer an FBA and it did not. And, as the Board found, L.M.'s reliance worked to her detriment. Henry County Schools cannot now use its ability to select from several potential positive behavioral interventions to shield it from fault.

## B

To receive tuition reimbursement L.M. must show that her unilateral placement at Summit Academy was proper. Proper placement, however, does not require the new school to meet all the IDEA requirements. But the new school must provide special education that is "reasonably calculated to enable the child to receive educational benefits." *Carter*, 510 U.S. at 15. And Summit does not.

---

[4] The School counters that an FBA is only mandated if: a child with a disability is removed from her educational setting due to behavior involving possession of a weapon, possession or use of illegal drugs, or the infliction of serious bodily injury on another person at school; or a child with a disability engages in behavior which would subject the child to expulsion if the behavior were not a manifestation of the child's disability.

L.M. has failed to show adequate objective evidence that Summit has provided the special education services that she needs. *See generally*, *Berger v. Medina School Dist.*, 348 F.3d 513, 522 (6th Cir. 2003). To begin, the headmaster of Summit did not know whether any of the students were disabled at his school. Tr. 487. More troubling, Summit had no overall plan for assisting L.M. *Id*. at 493-495. Instead, Summit has "priority goals" for each student but had no rubric to determine whether L.M. was advancing in her peer interactions. *Id*. at 487. Nor, was L.M. provided any of the special education services such as an FBA, occupational therapy, special education teacher, or an IEP. *Id*. at 299. As a result, there are none of the objective markers for a proper placement. L.M.'s social worker's testimony does not compel a different conclusion. While she reported that L.M. was happier at Summit, she never observed L.M. at Summit, had not spoken to her teachers, seen no educational documentation and falsely believed there were no disabled children at Summit. *Id*. at 294.

L.M.'s evidence of academic success is not enough to establish Summit as an adequate placement. *Berger*, 348 F.3d at 522. L.M.'s grade reports and presidential award do not provide an objective measure of success, because neither measure L.M.'s growth over her time at Summit or how she compares to her peers. What is more, the value of the Summit Academy's grade reports is undermined by the headmaster's lack of familiarity with Kentucky's educational standards and lack of degrees in education. Tr. 483. Without some comparison, the Court is left with evidence that functions like a yard stick with no markings. That will not do. But, in any event, academic results do not determine whether a private placement is proper. *Id.* None of the evidence presented by L.M. can displace the Board's determination that Summit was not a proper placement.

## C

Having found that L.M. was denied a FAPE but not entitled to tuition reimbursement, the Court is left to fashion an equitable remedy. The Court reviews the Board remedies in turn:

*1.* *Redo the FBA.* Henry County Schools correctly notes that L.M. may not return to its school. Because Summit does not rely on the faulty FBA, redoing the FBA is only necessary if L.M. returns to Henry County Schools. Should L.M. choose to return, then Henry County School must undertake a new FBA. While the Board found the need for a private behavioral consultant, that is unnecessary at this time. Instead, Henry County Schools must simply follow the proper procedures.

*2.* *Occupational Therapy.* The Board determined that L.M. was entitled to back occupational therapy. Henry County Schools argues that no occupational therapy was owed after L.M. went on homebound because the occupational therapy was closely tied to L.M.'s classroom experience. The Court sees no sound reason to disturb the Board's determination that L.M. would benefit from occupational therapy.

*3.* *Compensatory time.* The Board decided that L.M. was entitled to at least 300 minutes per week in the resource setting. Henry County Schools believes there is no evidence that L.M. needs help in a resource setting and that it is grossly excessive because it equates to almost one in every five days in the resource room. Given L.M.'s difficulties while at Henry County Schools, the Court has no reason to displace the Board's decision. Henry County Schools may revisit that determination at L.M.'s next IEP.

*4.* *Reimbursement for OLOP and Crossroads travel expenses.* The Board ordered Henry County Schools to reimburse the travel costs associated with L.M.'s attendance at the

Crossroads program. Because L.M. was not being denied a FAPE during the 2014-15 school year that award was improper.

## III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. The Plaintiff's Motion [R. 30] for Judgment Reversal of ECAB Decision in Part is **DENIED**;

2. The Defendant's Motion [R. 25] for Judgment of Reversal of ECAB Decision is **DENIED**;

3. ECAB's Decision is **UPHELD** with the modifications found in Section II.C.;

4. The remaining motions are **DISMISSED AS MOOT**; and

5. Attorneys fees will be determined upon a showing of the Plaintiff's attorney.

This the 20th day of September, 2019.

Gregory F. Van Tatenhove
United States District Judge